**UNITED STATES of America,**

v.

**Nicodemo SCARFO.**

**Civil No. 97–2780.**
**Criminal No. 88–00003–1.**

United States District Court,
E.D. Pennsylvania.

July 9, 1997.

---

David E. Fritchey, Asst. U.S. Attorney, Louis R. Pichini, Asst. U.S. Attorney, Philadelphia, PA, for Plaintiff.

Norris E. Gelman, Philadelphia, PA, for Defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### I. INTRODUCTION

On November 19, 1988, Nicodemo Scarfo, the former boss of the Philadelphia La Cosa Nostra Family, was convicted by a jury in a major mafia trial of RICO and RICO Conspiracy, Illegal Gambling Business, and two counts of Unlawful Distribution of Methamphetamine, 18 U.S.C. §§ 1962(c) and (d), 1963, 1955, and 21 U.S.C. § 841. The jury specifically found him guilty of thirty-two RICO predicate acts including eight murders, four attempted murders, two distributions of methamphetamine, one extortionate collection of credit, fourteen extortions, one Hobbs Act extortion and one illegal sports bookmaking operation. Post verdict motions were denied, *United States v. Scarfo*, 711 F.Supp. 1315 (E.D.Pa.1989), and Mr. Scarfo was sentenced to a fifty-five year term of imprisonment on May 11, 1989. This sentence was imposed consecutive to a fourteen year federal sentence previously imposed by Chief Judge John P. Fullam, and consecutive to a life sentence later imposed in state court for murder. Mr. Scarfo appealed his conviction, *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990); it was affirmed and his petition for certiorari was denied. 500 U.S. 915, 111 S.Ct. 2009, 2010, 114 L.Ed.2d 98 (1991).

On April 22, 1997, two days before the new statute of limitations period expired pursuant to the Anti–Terrorism and Effective Death Penalty Act of 1996, Mr. Scarfo filed the instant petition for relief under 28 U.S.C. § 2255. He makes three claims: (1) that the consecutive sentences that he received for RICO and RICO Conspiracy violated the double jeopardy prohibition within the Fifth Amendment; (2) that his sentence was based upon his conviction in an earlier state case in which he was later given a new trial and acquitted; and (3) that his trial counsel, Mr. Robert Simone, provided him with ineffective assistance of counsel because he was burdened by conflicts of interest that were either unwaivable, or insufficiently waived. We disagree. As the facts of this case have been much discussed by this court previously, *see Scarfo*, 711 F.Supp. 1315, we will not repeat ourselves.

### II. DISCUSSION

#### A. Double Jeopardy

Mr. Scarfo's first complaint stems from the recent Supreme Court decision of *Rutledge v. United States*, —— U.S. ——, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996). He argues that because the Supreme Court held in that case that conspiracy to distribute controlled substances (21 U.S.C. § 846) is a lesser included offense of the continuing criminal enterprise offense ("CCE") (21 U.S.C. § 848) and therefore convictions of both cannot amount to consecutive sentences, we should reconsider the Court of Appeals' decision in *Pungitore*, 910 F.2d at 1115–17. *Petition*, at 4. We disagree.

■ The question of whether the double jeopardy clause of the Fifth Amendment prohibits consecutive sentencing for RICO conspiracy and substantive offenses (18 U.S.C. §§ 1962(c) & (d)) has already been litigated and decided on Mr. Scarfo's direct appeal. "Once a legal argument has been litigated and decided adversely to a criminal defendant at his trial and on direct appeal, it is within the discretion of the district court to decline to reconsider those arguments if raised again in collateral proceedings under 28 U.S.C. § 2255." *United States v. Orejuela*, 639 F.2d 1055, 1057 (3d Cir.1981) (*citing Kaufman v. United States*, 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 1074 n. 8, 22 L.Ed.2d 227 (1969)); *see also Reed v. Farley*, 512 U.S. 339, 358, 114 S.Ct. 2291, 2302, 129 L.Ed.2d 277 (1994)(J. Scalia, concurring; "claims will ordinarily not be entertained under § 2255 that have already been rejected on direct review."). There is a great interest in the finality of litigation; matters fully addressed and decided on direct appeal should not be reexamined lightly.

In *Pungitore*, the Court of Appeals discussed the issue of consecutive sentences for RICO and RICO conspiracy in detail. Specifically, they addressed the question in light of another Supreme Court decision, *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), and held that the vast differences between § 1962 and §§ 846, 848 merited the conclusion that while consecutive sentences were not valid for the latter, they were for the former. Citing *United States v. Marrone*, 746 F.2d 957 (3d Cir.1984), which in turn cited *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the court further held that the statutory provisions in § 1962(c) and § 1962(d) defined different offenses under the law and as such cumulative punishment was presumptively valid. The court found no legislative intent to prevent consecutive sentencing, and that there was nothing within the CCE statute, or the cases which interpret them, that required otherwise. *Pungitore*, 910 F.2d at 1115–1116. Given the depth of their discussion, we see no reason to revisit the issue.

■ We find, however, that even if we were to reconsider pursuant to *Rutledge*, there is nothing in that opinion which would give us pause. Contrary to Mr. Scarfo's interpretation, the Supreme Court case is quite frankly in line with the Third Circuit's assessment of § 846 and § 848. The *Rutledge* court followed the logic in *Jeffers*, and, using the "same offense" test, held that consecutive sentences could not be imposed for CCE and CCE conspiracy because they are the same offense. The Court made no comparison or connection between the CCE and RICO statutes. In fact, it noted that its holding was not contrary to the holding in *Garrett v. United States*, 471 U.S. 773, 794–95, 105 S.Ct. 2407, 2419–20, 85 L.Ed.2d 764 (1985) that conspiracy and the substantive crime that is the object of the conspiracy are distinct offenses. *Rutledge*, —— U.S. at ——, 116 S.Ct. at 1247. As such, nothing in *Rutledge* undermines the ruling in *Pungitore* that RICO and RICO conspiracy are separate offenses because of the different elements of proof required; indeed, the rationale and holding of the cases are materially identical. We therefore decline to reevaluate

the measured opinion of the Court of Appeals.

*B. Sentencing*

■ Mr. Scarfo next argues that he is entitled to a resentencing because "he was sentenced based on the belief that he was guilty of the first degree murder of Frankie Flowers [D'Alfonso]." *Petition* at 4. Mr. Scarfo apparently believes that because his federal sentence was given consecutive to his state sentence in the D'Alfonso case, we were influenced in sentencing by that state conviction. Now that Mr. Scarfo has been given a new trial and has been acquitted in the D'Alfonso case, he argues, we must resentence him without reference to the state matter. We do not agree.

Mr. Scarfo was sentenced on May 11, 1989. At that time, we heard both Mr. Simone and the Government on the issue of sentencing. We imposed our sentence by saying the following:

THE COURT: ... Very well. We're prepared to impose sentence. The defendant will rise. Defendant—I'll say one further thing, Mr. Simone, I heard what you said about the system, and its inability, often, to reform people, and I think that's true. Sentencing is often difficult. Prison wastes lives, but in this case, I feel that I have no choice. This is a City of Brotherly Love, it's not a City of Murder. And, Congress has set maximum penalties, and if they don't fit this case, I don't know when they would ever apply.

Accordingly, the sentence of the Court is, that the defendant is hereby committed to the custody of the Attorney General of the United States of America, or his authorized representative, for imprisonment for a total term of 55 years. This sentence is composed of a sentence of 20 years on Count One, followed by a sentence of 20 years on Count Two, followed by a sentence of five years on Count Four, followed by a sentence of five years on Count Six, followed by a sentence of five years on Count Seven. They are all consecutive. And, of course, as I've indicated, I am referring to counts on the redacted indictment. On the superseding indictment,

Count Six would be Count Ten, and Count Seven would be Count Eleven.

Upon any release, I also impose a lifetime special parole term under Count[s] Six and Seven. I also impose a committed fine of $500,000, and find, that based upon the trial testimony, the defendant has the ability to pay the same. The fine is allocated one-half to Count One, and one-half to Count Four. The Court recommends an institutional security level of six and imposes a special assessment of $250. The sentence is imposed today. It shall be consecutive with, and shall follow the defendant's previous Federal sentence from Judge Fullam, and shall also be consecutive with the State [D'Alfonso] sentence imposed by Judge Clarke....

*Transcript*, 5/11/89 at 16–17.

It is clear that the only manner in which the D'Alfonso case impacted our sentence is that we imposed our sentence consecutive and not concurrent with the state sentence yet to be imposed. The sentence itself was not impacted by the fact of this prior state conviction. *Cf. United States v. Lyons*, 706 F.2d 321, 335 n. 25 (D.C.Cir.1983) (resentencing only necessary where it cannot be ascertained whether the district court's sentence was influenced by a conviction that was later overturned). Mr. Scarfo was convicted of RICO, and RICO conspiracy with 32 underlying Racketeering Acts, including eight murders and four attempted murders. The enormity of his crimes was staggering. This alone justifies the maximum penalty as set out by Congress, without any reference to or reliance on the state conviction. Ergo, the fact that the state sentence has been voided due to acquittal on re-trial does not impact the actual sentence imposed by this court, it only impacts when he will begin serving it. Resentencing is therefore not required.

### C. *Ineffective Assistance of Counsel*

#### 1. **Standard**

 right to have the assistance of counsel is provided for in the Sixth Amendment of the United States Constitution. This right has been deemed fundamental by the Supreme Court; it cannot be denied to the defendant absent intentional and actual waiver. *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938). The Supreme Court has set out a two-prong test to establish a claim of ineffectiveness of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A petitioner must show both that: (1) his counsel's conduct was deficient, and "fell outside the wide range of professionally competent assistance" and (2) the petitioner was prejudiced as a result of that deficient conduct. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1544, 128 L.Ed.2d 196 (1994).

██ To satisfy the first prong, deficiency, a petitioner must show that his counsel's conduct fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064. In evaluating such a claim, we "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. We may not use the benefit of hindsight to second-guess tactical decisions made by an attorney unless they are unreasonable. *See Id.* at 690, 104 S.Ct. at 2066; *Diggs v. Owens*, 833 F.2d 439, 444–45 (3d Cir.1987) ("An attorney is presumed to possess skill and knowledge in sufficient degree to preserve the reliability of the adversarial process and afford his client the benefit of a fair trial. Consequently, judicial scrutiny of an attorney's competence is highly deferential."), *cert. denied*, 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988). Moreover, the mere fact that a tactic has been unsuccessful does not necessarily indicate that it was unreasonable. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

██ If the first prong is proven, a petitioner must also prove the second prong, prejudice. To show prejudice, a petitioner must show that there is a reasonable probability that there would have been a different outcome; that the deficient performance "deprived the defendant of a trial whose result is reliable." *DeRewal*, 10 F.3d at 104, *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. We must examine the trial with our focus not on the outcome, but on whether the error so affected the adversarial balance that the trial was rendered unfair and the verdict rendered suspect. *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993).

## 2. Conflict of Interest

Mr. Scarfo grounds his ineffective assistance of counsel claim on his dual arguments that (1) his attorney had an unwaivable conflict of interest and (2) if the conflict was waivable, there was no waiver here. This is an extremely serious allegation, and we will consider it carefully. However, this complaint regarding Attorney Robert Simone is battle cry that is very familiar to the habeas claims of the *Scarfo* defendants, and is meritless in the face of the record.

■ First, Mr. Scarfo claims that Mr. Simone had an actual conflict of interest such that waiver of conflict free-counsel was unavailable. An actual conflict of interest occurs if "the defendants' interests diverge with respect to a material factual or legal issue or to a course of action such that the attorney finds himself in the untenable position of serving two clients with incompatible needs." *Pungitore,* 910 F.2d at 1141 (*citing United States v. Gambino,* 864 F.2d 1064, 1070 (3d Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989)); *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980) (actual conflict where counsel "actively represented conflicting interests"). In the event of the existence of an actual conflict, prejudice is not presumed; rather, "in order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's perfor-

mance." *Cuyler,* 446 U.S. at 348, 100 S.Ct. at 1718; *Pungitore,* 910 F.2d at 1141 (prejudice only presumed if the conflict results in a lapse in representation either in actions or omissions).

■ In the instant case, the possibility of an actual conflict was brought up before the court by counsel. On September 9, 1988, during a motions hearing, Mr. Pichini told the court that Mr. Simone was alleged by the two cooperating defendants to have participated in the extortion of Mr. William Rouse. This extortion, which involved several other of the defendants, was included in the indictment, and testimony was expected from the cooperating witnesses which implicated Mr. Simone. In addition, a number of the photographs expected to be introduced by the government included Mr. Simone with the defendants, and one of the cooperating witnesses was expected to testify that Mr. Simone was present during a conversation about one of the predicate act murders. *Transcript,* 9/9/88, at 46–47.

At that time, Mr. Simone agreed that he would not "inject his credibility" in cross-examining the witnesses. *Transcript* 9/9/88 at 47, 51. The court, after a full examination of the situation, said, "Now, we've got a problem here. Now what are we going to do about it? The answer is, that obviously I'm going to take a similar tact that the Chief Judge took but I will say this, I'm not going to preclude any lawyer from cross-examining any witness about anything, okay, but I'm not going to permit you to inject your personal theory and if you do, I'm going to bring you up short." *Transcript,* 9/9/88 at 51.[1] We further instructed the government to ensure that its witnesses did not blurt out any comments to the effect that Mr. Simone was present or involved. *Id.*

It was more than apparent to this court that Mr. Simone was not actively represent-

---

1. Mr. Scarfo had previously been on trial with Mr. Leland Beloff and Mr. Robert Rego in front of Chief Judge Fullam in 1987. In that case, the issue of Mr. Simone's conflicts with respect to the Rouse extortion also arose prior to trial, and Judge Fullam permitted Mr. Scarfo in a bench opinion to waive those conflicts after an extensive colloquy with Mr. Simone and Mr. Scarfo.

This bench opinion, dated April 14, 1987, was submitted to us for consideration by both parties during our motions hearing on September 9, 1989. *Transcript* 9/9/89 at 46. We agreed with Judge Fullam's opinion and manner of handling the conflict, and patterned our colloquy similarly.

ing conflicting interests; indeed, he was determined to ensure that his interests were subsumed to those of his client. Moreover, Mr. Scarfo has presented no evidence, absent his conviction, that his attorney's performance was adversely affected by this conflict, or that they held divergent interests. He points to no part of the record where Mr. Simone took, or omitted, an action to Mr. Scarfo's detriment due to his alleged conflicts. Because Mr. Scarfo did not object at trial to representation by Mr. Simone, the test for an unwaivable actual conflict is not, as Mr. Scarfo would have it, whether or not Mr. Simone was "tainted" in the eyes of the jury by his involvement in the Rouse extortion. Rather it is whether Mr. Simone was actively representing his own interests and thereby displacing the interests of his client. It is clear from the record that this is not the case. Indeed, as Mr. Simone stated, "I know better, not to protect myself. I am more interested in my client." *Transcript*, 9/9/89 at 57.

■■■ Moreover, it is not the case that all such conflicts are unwaivable. Where a conflict has been made known to the client and the court at trial, the District Court may permit waiver of conflict-free counsel. *United States v. Moscony*, 927 F.2d 742, 749–50 (3d Cir.), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991). The Court of Appeals noted in the direct appeal that where a conflict exists, the trial court may permit the conflict to be waived via a knowing, intelligent waiver so as to safeguard the Defendant's rights, and may take other precautionary measures as well. *Pungitore*, 910 F.2d at 1143. As such, the conflicts presented to this court by Mr. Simone were waivable, in that sufficient safeguards could be developed in the form of waiver and restrictions to protect Mr. Scarfo's interests.

■■■ Mr. Scarfo next complains that if the conflict was waivable, his waiver was incomplete. In the face of the record, however, this claim is without merit. As the Third Circuit stated in *Pungitore*, "it would be a rare case in which a defendant, after convincing the trial court not to disqualify his attorney of choice, should be able to obtain a reversal of his conviction on the basis of a

conflict of interests. The district court should not be placed in the no-win situation of being confronted with a claim of a Sixth Amendment violation if the defendant is convicted, regardless of whether it has ceded to the defendant's expressed desire to be represented by his conflict-ridden attorney, or has taken it upon itself to disqualify the attorney. If the defendant after disclosure insists on continued representation by the attorney and the court permits the representation to continue, any error is invited." *Pungitore*, 910 F.2d at 1143 n. 84.

The issue of possible conflicts and Mr. Scarfo's waiver of them appeared repeatedly early in the case. At the September 8, 1988 pre-trial motions hearing, a number of conflict issues were discussed. First, Mr. Simone spoke in detail about his business relationship with another attorney on the case, and stated that they were not associated in any way that would adversely affect either of their clients. This was done in front of those clients, and then the following occurred:

> THE COURT: And, you don't foresee anything arising in this trial in which the interest of your client would be adverse to those of Mr. Capone?
>
> MR. SIMONE: No, sir.
>
> THE COURT: Mr. Scarfo, I'll have to ask you if you agree with what your attorney has just said, sir?
>
> MR. SCARFO: I agree with him.
>
> THE COURT: You agree with it. All right.

*Transcript*, 9/8/88 at 47–50.

Next, Mr. Simone testified about the extent to which he had represented a number of people connected with the case including Mr. Caramandi and Mr. DelGiorno. Subsequently, the following occurred:

> THE COURT: Mr. Scarfo, having heard all of that, you want him [Mr. Simone] to be your lawyer nevertheless?
>
> MR. SCARFO: Yes.
>
> THE COURT: All right. Thank you, sir.

*Transcript*, 9/8/89 at 57–58.

In addition, a few minutes later, Mr. Simone informed the court of various other possible conflicts that had been made known

to all defendants. We asked, "is there any defendant that does not agree with what Mr. Scarfo has said? Any counsel that does not agree with it?" When the defendants remained silent or shook their heads "no," we said, "all right. Thank you." *Id.* at 60.

On September 9, 1988, after Mr. Simone assured the court that there was no actual conflict in terms of his association with the Rouse extortion specifically, and in terms of the possibility that he was a witness to some of the events testified to, the following occurred:

THE COURT: Alright. Just one further thing, I think we have to bring Mr. Scarfo up and I think you have to tell him about this and he has to indicate whether or not it's a problem.

MR. SIMONE: All Right.

(pause.)

MR. SIMONE: If your Honor please, for the record—

THE COURT: Mr. Scarfo, how do you do, sir.

MR. SIMONE:—let me just say, Mr. Scarfo was represented by me from approximately 1980 on court matters and I gave him advice in connection with certain things in the seventies when he had problems before the New Jersey Senate investigating committee. So he knows me as a lawyer and I've also had dinner with him on many occasions and I've been in his company, which the photographs will show and I've been on a boat that he—we're friends as well as client-attorney.

Now Mr. Scarfo was the defendant in a case that's known as the Rouse extortion case and in that case I had represented Leland Beloff at one point, and also there were accusations made by two witnesses DelGiorno and Caramandi, mostly DelGiorno—mostly Caramandi. There was a motion by the Government to disqualify me in that case for conflict of interest because I represented Beloff and also something to do with the Code of Professional Responsibility and also there was a question of whether I was going to be called as a witness for the Government or a witness for the defense. Mr. Scarfo at that point waived his right to call me as a witness.

The Government never did call me as a witness and they indicated that they weren't going to.

The bottom line was that Judge Fullam, after giving it a great deal of thought, I must say, because it took awhile after the hearing, he handed them an order, an opinion order which stated that Mr. Scarfo was entitled to be represented by counsel of choice and under the Eighth Amendment.

However, he limited my role in the case and I had to bring in co-counsel that was Miles Feinstein. I must say that I was not permitted to cross-examine DelGiorno or Caramandi in that case or to make any reference to their credibility. During the trial, Mr. Miles Feinstein cross-examined Caramandi and Delgiorno did what they expected—

THE COURT: Please can we have it quiet.

MR. SIMONE: The record will reflect that Mr. Feinstein did what I was expected to do and that was to try and defend me and to be honest with you, it hurt Mr. Scarfo. I would not have tried to defend myself nor would I have put my credibility in (coughing) as to their credibility. Mr Scarfo was convicted in that case.

In subsequent cases, I've been permitted to participate fully as Mr. Scarfo's lawyer before Judge O'Neill, before Judge Sabo, in a homicide case and I also represented Mr. Staino in a case before Judge O'Neill.

Now in the cases I represented Mr. Scarfo, whenever DelGiorno and Caramandi, in front of a jury that is, there have been hearings, whenever DelGiorno and Caramandi have mentioned my name, I just skirt around it. I mean, I just ignored it and I think other counsel that were participants in the trial noticed that. I ignore it. What I'm saying is, Mr. Scarfo is hearing everything that I'm saying. You understand that there's a problem that these men are saying certain things about me as well as about other lawyers and the Judge may have to admonish me if I step out of line. Mr. Pichini and the other prosecutors may have to, in the per-

formance of their duties object to certain things that I might do that I don't think, but I don't know that is wrong until the Judge agrees they're wrong, then that could have some, you know, bearing and effect on your case. Are you willing to continue on?

MR. SCARFO: I think they say anything about you. You're my lawyer and that's it.

MR. SIMONE: Okay.

THE COURT: Mr. Scarfo one other thing and I'm not saying he's going to do this, but there's a natural human tendency sometimes if someone is charged with a crime that he might try to save his own skin, so to speak, if you understand, he might not want things to come out concerning him to your detriment. You understand that?

MR. SCARFO: Yes, sir.

THE COURT: Now, I'm not saying that's going to happen in this case but it's a normal human tendency that some people have. Knowing that you still want Mr. Simone to be your lawyer?

MR. SCARFO: I still want Mr. Simone—yes, sir.

THE COURT: You're sure?

MR. SCARFO: Yes, sir.

THE COURT: Okay, fine

MR. SCARFO: Thank you, your honor.

MR. SIMONE: Thank you, your honor.

THE COURT: Can anybody—just one other thing. Can you think of anything else we should—

MR. SIMONE: The pictures, let me see. Mr. Gordon mentioned that there's going to be pictures with me. When I've seen these pictures in other trials and I don't know how—I mean, what can I do that's going to be harmful to the Government with regard to these pictures. I don't understand. What am I—you know, I don't—there's never been any problem with any.

MR. PICHINI: If you make any kind of comment during the course of the trial that you were there and there's nothing that went wrong or something—

MR. SIMONE: That's not—

THE COURT: No, no that's—

MR. SIMONE: That's absolutely a lie. I never did—

THE COURT: I'm precluding him from personally stating when he's questioning somebody on cross-examination. I'm precluding him from his closing argument from saying, look, you can take it from me, I was there—you understand that.

MR. SCARFO: That's all right, Judge.

THE COURT: And that causes you no problem, you still want him as my lawyer.

MR. SCARFO: Nope, I still want him as my lawyer.

THE COURT: Mr. Scarfo, thank you, sir.

MR. SCARFO: Thank you, your honor.

MR. PICHINI: Just one question. To what extent will Mr. Simone be able to cross-examine about the Rouse extortion since it is there, what do you anticipate with respect to the jury?

MR. SIMONE: I don't expect to go into a great deal of cross on it either. If you were to give up and have a little more confidence in me, I was just going to touch on it and I was going to pass it on to other lawyers because if there are certain things that have to come involving me, I don't want to be the one to do it. I know better, not to protect myself. I am more interested in my client.

THE COURT: Well, again, you know, admittedly it is possible to inject your own opinions in a very clever fashion without, you know, seeming to do it. If I see that happening, I'm going to stop it, okay?

MR. SIMONE: Your honor, I'll be on my toes more so. I'll be on my toes more so.

*Transcript,* 9/9/88 at 52–5

Clearly, all of the conflicts surrounding Mr. Simone's representation of Mr. Scarfo were both known to Mr. Scarfo and waived by him affirmatively, repeatedly, and in open court. He has presented no evidence of a conflict that was not expressly explained to him, and then waived by him. Indeed, in reviewing the appeals of the defendants in this case, the Third Circuit examined the record and stated, "the district court then explained to Scarfo the risks inherent in Simone's continued representation of him.

Scarfo, however, insisted that he wanted Simone to represent him.…" *Pungitore* 910 F.2d at 1138. To argue otherwise at this point is to completely disregard the extensive waivers on record. Mr. Scarfo cannot eat his cake and have it, too; he cannot argue repeatedly for Mr. Simone to be his attorney despite a laundry list of conflicts, and then complain that he should have been denied that choice, or that he was unaware of the conflicts.

### III. CONCLUSION

Our thorough review of the record in this matter points us indisputably to the conclusion that Mr. Simone did not provide Mr. Scarfo with ineffective assistance of counsel. Further, we see no reason to conclude that a resentencing is required because the state conviction had no impact on our initial sentence. Finally, we decline to revisit the issue of the consecutive sentences Mr. Scarfo received following his conviction of RICO and RICO conspiracy as the Court of Appeals has already considered it so completely.

For the foregoing reasons, we will deny Mr. Scarfo's petition for relief pursuant to 28 U.S.C. § 2255.